

FILED
2016 Aug-04  AM 09:46
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ALABAMA
### JASPER DIVISION

| | | |
|---|---|---|
| MELISSA BYARS | ) | |
| | ) | |
| | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | CIVIL ACTION NO. |
| | ) | 6:15-CV-00303-KOB |
| | ) | |
| CAROLYN W. COLVIN | ) | |
| ACTING COMMISSIONER OF | ) | |
| SOCIAL SECURITY | ) | |
| | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |
| | ) | |

## MEMORANDUM OPINION

## I. INTRODUCTION

On March 5, 2012, the claimant protectively applied for disability insurance benefits and supplemental security income under Title II and Title XVI of the Social Security Act. In both applications, the claimant alleged disability beginning February 28, 2012, because of nerve damage to the right leg, right knee problems, Sympathetic Dystrophy, Post-Traumatic Stress Disorder (PTSD), and foot problems. The Commissioner denied these claims on June 15, 2012. (R. 92-93, 101). On June 25, 2012, the claimant filed a written request for a hearing before an Administrative Law Judge, and he held a video hearing on August 15, 2013. (R. 53-54).

In a decision dated October 18, 2013, the ALJ found the claimant was not disabled as defined by the Social Security Act and was, therefore, ineligible for supplemental security

income. (R. 7-23). On December 16, 2014, the Appeals Council denied the claimant's request for review; consequently, the ALJ's decision became the final decision of the Commissioner of the Social Security Administration. (R. 1). The claimant has exhausted her administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons stated below, the court AFFIRMS the decision of the Commissioner.

## II. ISSUE PRESENTED

Whether the ALJ properly assessed the claimant's credibility and subjective complaints under the Eleventh Circuit Pain Standard.

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must affirm the Commissioner's decision if the Commissioner applied the correct legal standards and if his factual conclusions are supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999. This court does not review the Commissioner's factual determinations *de novo*. The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 402 (1971).

The court must keep in mind that opinions such as whether a claimant is disabled, the nature and extent of a claimant's residual functional capacity, and the application of vocational factors "are not medical opinions, . . . but are, instead, opinions on issues reserved to the

Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(d), 416.927(d). Whether the claimant meets the listing and is qualified for Social Security disability benefits is a question reserved for the ALJ, and the court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). Thus, even if the court were to disagree with the ALJ about the significance of certain facts, the court has no power to reverse that finding as long as substantial evidence in the record supports it.

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not only look to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A). To make this determination the Commissioner employs a five-step, sequential evaluation process:

> (1) Is the person presently unemployed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
> (4) Is the person unable to perform his or her former occupation?

(5) Is the person unable to perform any other work within the economy?

An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986)[1]; 20 C.F.R. §§ 404.1520, 416.920.

When evaluating subjective complaints, such as pain, the Commissioner must apply the Eleventh Circuit's pain standard. The Commissioner must determine whether:

(1) there is evidence of an underlying medical condition; and *either*
(2) objective medical evidence confirming the severity of the alleged pain arising from the condition *or*
(3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.

*Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (emphasis added); *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991); *Landry v. Heckler*, 782 F.2d 1551, 1553 (11th Cir. 1986). The ALJ does not have to recite the pain standard word for word; rather the ALJ must make findings that indicate that he applied the standard. *Holt*, 921 F.2d at 1223. A claimant's subjective testimony supported by medical evidence that satisfies the pain standard is itself sufficient to support a finding of disability. *Foote*, 67 F.3d at1561. The ALJ must articulate reasons for discrediting the claimant's subjective testimony. *Brown v. Sullivan*, 921 F.2d.1233, 1236 (11th Cir. 1991). If the ALJ does not articulate his reasons for discrediting, then the court must accept the claimant's testimony as true. *Id.*

Further, in evaluating pain and other subjective complaints, the Commissioner may consider the claimant's ability to perform certain activities of daily living (ADLs), as well as the

---

[1] McDaniel v. Bowen, 800 F.2d 1026 (11th Cir. 1986) was a supplemental security income case (SSI). The same sequence applies to disability insurance benefits. Cases arising under Title II are appropriately cited as authority in Title XVI cases. See, e.g., Ware v. Schweiker, 651 F.2d 408 (5th Cir. 1981) (Unit A).

impact of such activities on the claimant's credibility. 20 C.F.R. §§ 404.1529 (c)(3)(i),
416.929(c)(3)(i); *see also Macia v. Bowen*, 829 F.2d 1009, 1012 (11th Cir. 1987) (finding that
ADLs may be relevant to the fourth step of the sequential process).

## V. FACTS

The claimant was forty-eight years old at the time of the ALJ's final decision. The
claimant has a 10th grade education and past relevant work as a molder/trimmer and book keeper.
(R. 29) The claimant alleged disability beginning on February 28, 2012 from many impairments,
including nerve damage to the right leg, right knee problems, Sympathetic Dystrophy, Post-
Traumatic Stress Disorder, and foot problems. (R. 92).

*Physical Limitations*

On June 20, 2003, the claimant underwent a magnetic resonance imaging scan (MRI) of
her right knee, which revealed a small joint effusion; the scan showed a low density signal of the
tibial plateau, assumed to be cartilage, and did not show any bone bruising. (R. 240).

From January 2006 to November 2007, the claimant visited Family Medical Associates
fourteen times. In February 2007, the claimant complained of headaches and dizziness as
possible side effects of medication, but denied any persisting side effects at the follow up
appointments. Beginning in July 2007, the claimant reported knee, leg, and ankle pain, as well as
swelling around her ankle; these complaints persisted through November 2007. (R. 245-258).

At some time prior to February 2010, the claimant initiated pain management treatment at
PainSouth, Inc.; treatment consisted of prescriptions including KBCDG Cream, Lortab,
Topamax, and Zanaflex. On February 3, 2010, Dr. Cosgrove diagnosed the claimant with Reflex
Sympathetic Dystrophy and Chronic Pain Syndrome; however, her treatment remained

unchanged. During that appointment, the claimant denied any side effects and rated her pain "7/10 on a scale of 0 to 10." (R. 306-307).

On April 29, 2010, the claimant complained that her first dose of medication caused drowsiness that she had to "sleep off" but that the rest of the dosages did not adversely affect her; she has not reported drowsiness since February 15, 2011. (R. 285, 303).

On May 27, 2010, the claimant complained of headaches and difficulty sleeping, which she attributed to amitriptyline; the claimant voluntarily discontinued this medication.

On June 24, 2010, the claimant reported side effects including numbness in her face and difficulty sleeping. The claimant stated that her difficulty sleeping must be a result of gabapentin because she "was sleeping good before this." The claimant did not report any more instances of these particular side effects from her medications at any follow-up appointment after June 2010. (R. 297, 300).

From July 2010 to May 2011, the claimant visited PainSouth five times. At each appointment the claimant denied any adverse side effects, except for drowsiness at the February appointment, which Dr. Cosgrove attributed to her daily routine[2]. (R. 282-296).

From June 2011 to September 2011, the claimant visited PainSouth twice. On June 14, 2011 and September 12, 2011, she explicitly denied any side effects and rated her pain "7/10"; however, on September 12, 2011, she reported a pain increase. She reported that the pain was constant and varied with activity. (R. 276, 279).

From December 2011 to May 2012, the claimant visited Dr. Cosgrove four times. On December 6, 2011, March 6, 2012, April 4, 2012, and May 9, 2012, she reported pain levels of "8/10," "5.5/10," "7/10," and "5/10" respectively. At each appointment, she reported the same

---

[2] The claimant wakes up at 4:00am every morning, takes her medications, goes back to sleep, and wakes up at 9:00am to start her day.

"moderately active" activity level, initially listing that she exercised by walking. She also explicitly denied any adverse side effects at each appointment. Each of Dr. Cosgrove's physical examinations yielded the same results, as described below. (R. 266-275, 318-320).

During the December 6, 2011 appointment, the claimant reported that her pain was "basically unchanged from the previous visit." In the prior appointment, on September 12, 2011, she rated her pain "7/10," but in this December appointment she reported an "8/10." Dr. Cosgrove also noted a discrepancy in this appointment: "the claimant reported the Lortab to be moderately effective despite the reported high pain scores." Dr. Cosgrove prescribed Mobic and made no other changes to her medication regimen. (R. 273-276).

At the March 6, 2012 appointment, the claimant reported that Mobic was helpful in reducing inflammation in her right ankle; she reported the pain medication to be "moderately effective in controlling her pain, but not as ef[f]ective as [she] would like." Dr. Cosgrove noted that he and the claimant had discussed a spinal cord stimulator trial in the past, but the claimant elected not to have the procedure. Other than prescribing the claimant Nucynta, Dr. Cosgrove made no changes to her medication regimen. (R. 269). Her follow-up appointment on April 4, 2011 was identical to her March appointment aside from the claimant's increased dosage of Nucynta. (R. 266-272).

The claimant's May 9, 2012 appointment revealed inconsistent reports where the claimant both described pain in her ankle and explicitly denied any complaints of pain. When she described pain, she reported it as constant and varying in intensity and quality by time of day and activity levels. (R. 318).

On August 1, 2012, the claimant rated her pain as "5/10." She reported no change in her activity level, and physical examination results generally yielded the same results; however, she reported adverse side effects from her medications including nausea and vomiting. (R. 315-318).

Between November 2012 and May 2013, the claimant went to PainSouth three times. On November 1, 2012, January 1, 2013, and May 9, 2013, she reported pain levels of "6/10," "5/10," and "5/10" respectively. She continued to report the same "moderately active" activity level and physical examination results remained the same. In November, she stated that her side effects had improved, but in January 2013 she reported experiencing nausea; however, the claimant attributed the nausea to her Mobic medication and voluntarily discontinued it. (R. 330-343).

The record contains no evidence of required treatment at an emergency room, or hospitalization from April 2012 to May 2013. (R. 266-268, 315-320, 330-343).

*Mental Limitations*

In May of 2005, the claimant visited Baptist Health Center where she reported depression, anxiety, and nervousness resulting from a family tragedy. Four months later, in September 2005, she revisited the clinic claiming the same symptoms, and added that she was suffering from nausea. She was not diagnosed with Post-Traumatic Stress Disorder during either of these visits. (R. 259-260).

From January 2006 to November 2007, the claimant regularly visited Family Medical Associates. The claimant began reporting "anxiety/depression" to Family Medical Associates on October 13, 2006. She denied "anxiety/depression" from December 2006 to October 2007. On November 12, 2007, the claimant reported that her anxiety and depression had returned. (R. 245-258).

From February 2010 to May 2013, the claimant regularly saw Dr. Cosgrove at PainSouth, Inc. The claimant reported depression beginning in February 2010 and consistently reported it at each appointment through May 2013, but Dr. Cosgrove never diagnosed her with Post-Traumatic Stress Disorder. (R. 266-320, 330-343). Furthermore, the record indicates that she had never been to mental health counseling, taken any medication for PTSD, or seen a psychologist or a psychiatrist. (R.245-320, 330-343).

The claimant completed a function report on April 4, 2012 at the request of the SSA. In Section B of this self-assessment, she reported that *every day* she gets up at 4:00am, takes her medicine, returns to bed, and wakes up around 9:00am. She added that she "tries to clean house and do laundry, but it takes her all day." In Section C, the claimant reported that she could only lift 5 pounds, that she could not squat or bend, and that her ankle has a tendency to give way or turn over. She also reported that she could only walk 10 feet with 30 minute rests. The claimant also indicated that she could cook, perform light housekeeping, and do laundry. The claimant reported that meal preparation generally consisted of assembling sandwiches and cooking vegetables every other day and generally took about "1 ½" hours. She also reported completing housework and laundry one day each week, but noted that these activities may take "all day" to complete. The claimant indicated that drowsiness caused by her medications prevented her from driving and participating in social activities and added that she sits on the porch 20 minutes each day. She also reported that pain sometimes interrupts her sleep. Her hobbies included reading, but sometimes her pain frustrated her, and she must "give up on [her] book." However, she also indicated that she completes everything she starts including "[f]or example, a conversation, chores, reading, watching a movie." The claimant also indicated that aside from mowing the front lawn, she did not need help in maintaining her residency. (R. 183-192).

On May 9, 2012, the claimant's sister-in-law, Janine Wright, completed a "Function Report-Adult-Third Party." She reported similar written answers. For example, in Section B, Mrs. Wright reported the exact same daily routine for the claimant. In Section C, Mrs. Wrights stated the same physical limitations regarding lifting capacity, ability to squat or bend, the claimant's weak ankle, and the claimant's need to take rests. Additionally, Mrs. Wright reported the same time estimations: the claimant takes "1 ½" hours to cook; she takes all day to clean and do laundry; she sits on the porch for 20 minutes each day; she needs 30 minute breaks while walking.  Mrs. Wright also reported that the claimant cooks "sandwiches and frozen vegetables," performs "minimal housecleaning and does laundry"; she added that a family member assists the claimant in dusting and cleaning. (R. 183-192, 214-219).

Dr. Samuel D. Williams, at the request of the SSA, completed a psychiatric review of the claimant's records on June 13, 2012; he did not personally examine the claimant.  He noted that the claimant did not meet the diagnostic criteria for a listing-level anxiety disorder. He further noted that the claimant's anxiety did not restrict activities of daily living; did not present difficulties in maintaining social functioning or concentration, persistence, or pace; and were not associated with repeated episodes of decompensation of extended durations. Dr. Williams also stated that while the claimant indicated some memory and concentration problems, she also indicated that she was "good" at following written and spoken directions. Dr. Williams also noted that the claimant was not currently receiving any formal mental health treatment. He concluded that the claimant's mental conditions seem to be well-controlled on her current medical regiment and should not be expected to cause any significant functional limitations. (R. 96-99).

On June 13, 2012, Mr. T. Wallace, a single decision maker with the Social Security Administration, completed a physical residual functional capacity assessment on the claimant. Mr. Wallace did not examine the claimant in person, but completed this assessment based on the entirety of the claimant's medical records. Mr. Wallace noted that the claimant had Major Joint Dysfunction and an Anxiety Disorder. He determined that the claimant's allegation of anxiety was non-severe because it did not restrict her daily activities and did not present difficulties in maintaining social functioning, concentration, persistence, and pace, nor did it create episodes of decompensation. He determined that the claimant's Major Joint Dysfunction was severe, but did not precisely satisfy diagnostic criteria. He concluded that the claimant could stand or walk for 6 hours of an 8-hour work day with normal breaks; could sit for 6 hours with normal breaks; could lift 10 pounds frequently or 20 pounds occasionally; could occasionally use lower right extremities to push or pull foot controls; could occasionally climb ramps/stairs, balance, stoop, and crouch; could not work on ladders/ropes/scaffolds; and should avoid extreme cold temperatures, vibrations, hazardous machinery, or unprotected heights; and could not drive commercially. (R. 92-102).

*ALJ Hearing*

After the Commissioner denied the claimant's request for disability insurance benefits and supplemental security income, the claimant requested and received a hearing before an ALJ on August 15, 2013. (R. 5-6). At the hearing, the claimant testified that her combination of impairments prevented her from maintaining concentration, persistence, and pace to maintain an 8 hour work day. She also testified to her difficulty walking and her constantly swollen leg. At the hearing, she alleged impairments including Reflex Sympathetic Dystrophy of the right lower

extremity, Chronic Pain Syndrome, pain in the joint of the ankle and foot, anxiety and depression. (R. 30). She also testified to problems with Post-Traumatic Stress Disorder. (R. 37).

The claimant described her alleged pain as constant, burning, and stinging. The claimant stated Dr. Cosgrove prescribed her a new medication in March 2012 called Nucynta and recently increased the dosage. The claimant stated that Nucynta replaced her Lortab prescription because the Lortab was completely ineffective; despite taking four Lortabs daily, the medication did not alleviate her pain at all.

Regarding the effects of her alleged pain, the claimant testified that Nucynta never ceased her pain completely, but simply "lulls the pain enough that it's tolera[ble]." The claimant stated that she is unable to stand for more than 5-10 minutes, cannot walk for more than 10 minutes, and cannot sit for more than 15-20 minutes. She testified that her leg stays swollen "24/7," so she must elevate her leg in a reclined position for 90 minutes each day[3]. (R. 30-32).

When asked about the activities she participates in on a daily basis, the claimant testified that she tries to read, but her pain distracts her and she has to stop; most of the time, she sleeps because of the medication. The claimant testified that she cooks for herself by assembling sandwiches or using the microwave. She also stated that her sister-in-law helps her clean once a week. She does not shop, participate in social activities, go to the movies, eat out, or visit friends or family because she has not driven in a year. (R. 35-36).

Regarding the claimant's allegation of PTSD, at the hearing the claimant initially indicated that she was receiving treatment for anxiety and depression. After further questioning, she stated that she was not on any medication because side effects from her medications [4] made

---

[3] The claimant specifically stated that she must elevate her foot 30 minutes, three times a day.
[4] The court is unclear about what medications the claimant referenced when she said "because with that medicine and this medicine, I felt like a zombie." The court cannot find any recorded diagnoses of PTSD treated with medication.

her "fe[el] like a zombie." The claimant listed drowsiness, nausea, headaches, and dizziness among the side effects she was already suffering. When asked again whether she had received treatment for anxiety or depression, she responded that she had not. When questioned about the events leading up to her alleged PTSD, she testified that she had not seen a psychiatrist. (R. 36-37).

Regarding her work history, the vocational expert John W. McKinney III testified that the claimant previously worked as a molder/trimmer, classified as medium and unskilled work, and as a book-keeper. When asked specifically about her book-keeping job, the claimant testified that her husband created the job for her. The claimant held this job for duration of the 2006 year, during which she was responsible for inputting data into Quickbooks for two hours each week. She was considered a salaried employee and received $13,821.00 that year. (R. 38-40).

Mr. McKinney then testified concerning the type and availability of jobs that the claimant was able to perform. Mr. McKinney stated that a younger aged individual with a 10th grade education and the same work history and physical limitations as the claimant, who also had mild psychological restrictions, would not be able to perform the claimant's past relevant work. However, he testified that alternative work was available including work as an information clerk, which had 550 positions available in the state and 27,500 positions available nationally; an order clerk, which had 300 positions available in the state and 15,000 positions available nationally; and a hand-packager, which had 430 positions available in the state and 20,000 positions available nationally.

Mr. McKinney also testified that pain preventing concentration for two hours would eliminate all job opportunities. He stated that an individual who was required to elevate her foot to waist-level during the workday would have no available job opportunities. Mr. McKinney

further testified that employers would not be able to accommodate regular work breaks (beyond those which are generally scheduled for unskilled work) in a competitive work environment. Finally, Mr. McKinney stated that two absences per month were excessive for maintaining employment and that the inability to perform from 32 to 40 hours weekly would eliminate all job opportunities. (R. 40-44).

## VI. ALJ OPINION

On October 18, 2013, the ALJ determined that the claimant was not disabled under the Social Security Act. The ALJ found the claimant met the insured status requirement of the Social Security Act through June 30, 2012 and had not engaged in substantial gainful activity since February 28, 2012, the alleged onset date of disability. (R. 7-13).

Next, the ALJ found that the claimant suffered from severe impairments of Reflex Sympathetic Dystrophy (RSD) of the right leg with Regional Pain Syndrome. The ALJ found allegations of PTSD non-severe and stated that the record contained no objective medical evidence to support the claim. The ALJ found no diagnosis of PTSD and noted that the claimant had never participated in mental health counseling nor seen a psychologist.  The ALJ also gave significant weight to that state agency psychiatric consultant, Dr. Williams, who found that the claimant had no severe mental impairment and that the claimant's alleged PTSD did not restrict the claimant's daily activities; did not produce difficulties in maintaining social functioning or maintaining concentration, persistence or pace; and did not cause episodes of decompensation.

Additionally, the ALJ considered whether the claimant met any requirements from the Listing of Impairments. He found that none of the claimant's impairments, singly or in combination, manifested the specific signs and diagnostic findings required by the Listing of Impairments. (R. 13).

The ALJ then determined that the claimant had the residual functional capacity to perform sedentary work with a sit/stand option, as defined in 20 C.F.R. 404.1467(a), such that the claimant could occasionally lift 10 pounds; could, with normal breaks, sit 6 hours of an 8 hour workday; could stand or walk up to 3 hours of an 8 hour workday; could occasionally climb ramps or stairs; could never climb ladders, ropes, or scaffolding; could occasionally balance, stoop, and crouch; could not work around extremely cold temperatures, vibrations, hazardous machinery, or unprotected heights; could not drive commercially; and could walk around the desk or workstation throughout the day.

In considering the claimant's subjective allegations of pain, the ALJ applied the controlling pain standard of the Eleventh Circuit and found that the claimant's allegations of pain were not fully credible when considered in light of the entire record. The ALJ concluded that, although the claimant's medically determinable impairments could reasonably be expected to cause symptoms, the claimant's allegations regarding intensity, persistence, and limiting effects of these symptoms were not fully credible to the extent that the allegations are inconsistent with the residual functional capacity. The ALJ stated that the record clearly shows that the claimant's conditions are stable and do not significantly impact her ability to perform work activity. (R. 14-15)

First, the ALJ noted that the claimant's subjective allegations were inconsistent with medical records to the extent that treatment was mostly routine and conservative in nature. The ALJ referenced medical records from 2011 to 2013, which showed that the claimant's pain management treatment consisted only of medications. Specifically, the ALJ referenced treatment records from Dr. Cosgrove of PainSouth, Inc., which showed that the claimant was generally seen for scheduled follow-up visits and refills of the same medication every three months; these

medications included Keppra, Lortab, Flector, Topamax, and Zanaflex. (R.266-320, 330-343). Additionally, the ALJ noted that between April 2012 and May 2013, the claimant was neither hospitalized nor was she treated in an emergency room. Thus, he concluded that the claimant's treatment was routine and conservative, and did not reflect an impairment or combination of impairments that were disabling. (R. 15).

Next, the ALJ considered the treatment's general success in controlling the claimant's symptoms and found it inconsistent with the claimant's allegations of persistent pain. An MRI of the claimant's knee in 2003 showed a "small joint effusion." Through the use of cortisone injections and physical therapy in 2007, the claimant's pain improved as well as her range of motion. (R. 14, 65, 239-240). The ALJ further noted that despite the claimant's alleged painful condition, she was able to sustain  substantial gainful activity through 2008. (R. 15).

The ALJ also used a detailed analysis of the medical records to show the treatment's general success in controlling the claimant's symptoms. In December 2011, the claimant reported persistent pain in the right leg and ankle; however, the ALJ noted that the claimant stated she was "moderately active" and exercised by walking despite her persisting pain. The ALJ also noted that the claimant denied any side effects in the same December 2011 appointment. The ALJ further noted that the results of the claimant's physical examination (conducted by Dr. Cosgrove) produced mild results. (R. 15, 273-274).

The ALJ then noted that during her follow-up appointment in March 2012, the claimant reported that her Mobic medication helped reduce inflammation in her right ankle and improved her pain. He also noted that she rated her pain a 5.5 on a scale of 10 and denied side effects again. (R. 15, 269).

The ALJ considered the six appointments between April 2012 and May 2013; he noted that the claimant was only seen at regularly scheduled appointments separated by three-month intervals, and only when the claimant needed medication refills. He also noted that musculoskeletal and neurological examinations remained unchanged, as did the claimant's consistent denial of side effects.

The ALJ also noted that in January 2013, the claimant reported side effects including nausea, but the claimant attributed it to her Mobic medication and voluntarily discontinued it.

Finally, the ALJ noted that the claimant consistently rated her pain a "5/10" [5] between March 2012 and May 2013, and in August 2012[6] the claimant denied any pain, both of which he found inconsistent with persistent debilitating pain.

Therefore, the ALJ concluded that the records clearly showed the claimant's symptoms were stable on her medication and the severity of this condition did not preclude her from performing work activity within a sedentary residual functional capacity with a sit or stand option. However, the ALJ considered the fact that the claimant does have RSD with Regional Pain Syndrome, so he extended the benefit of the doubt to the claimant and assessed her with a limited range of sedentary work. (R. 15-16, 266-320, 330-343).

The ALJ also discredited the claimant's subjective testimony based on multiple instances where the claimant's statements contradicted her prior admissions and medical records. The ALJ noted that in the hearing, the claimant testified that, despite taking four Lortabs daily, she can only stand for 5-10 minutes, walk for 10 minutes, and sit for 15-20 minutes; however, the claimant described herself as "moderately active" at every appointment since December 2011. (R. 266-279, 315-320, 330-343). The ALJ also noted, in the same hearing, that the claimant

---

[5] The claimant had seven appointments between March 2012 and May 2013. She reported pain levels of 5.5, 7, 5, 5, 6, 5, and 5 respectively.
[6] The claimant did not deny pain in August 2012; she denied pain in May 2012.

testified that she is unable to perform her daily activities and spends most of her day sleeping and lying down; however, in the "Function Report-Adult" on April 14, 2012, the claimant reported that she engages in a wide range of daily activities, including cooking, light housecleaning, and laundry every day, [7] and needs no help in maintaining her residency.

Finally, the ALJ considered the claimant's allegations of side effects. The ALJ noted that the claimant testified that her medications made her "feel like a zombie." She also testified to side effects including "drowsiness, nausea, and headaches"; however, the ALJ pointed out that the medical record shows that the claimant consistently denied any side effects from July 2010 to May 2012. (R.16, 183-192).

Therefore, the ALJ concluded that the claimant's testimony was inconsistent with her allegations of chronic pain, but was consistent with the ability to perform a limited range of sedentary work. (R. 24-44, 183-192).

The ALJ also considered the effect of the claimant's work history on the claimant's credibility. The ALJ referenced the claimant's Work History Report, which showed the claimant's own admissions regarding her work history from 1997 to 2012. The ALJ also referred to the claimant's Wage Request. The ALJ used these reports and noted that the claimant only worked sporadically prior to the alleged onset date; the ALJ stated that this work history raises the question as to whether the claimant's continuing unemployment was actually because of medical impairments. Moreover, the ALJ stated that the claimant did not work for several years prior to the disability onset date. (R. 16).

Finally, the ALJ noted the claimant's allegation that her leg remains swollen "24/7," and she must elevate her leg; however, after reviewing the record, the ALJ stated that no physician

---

[7] The claimant actually reported cooking every *other* day; she reported performing light housecleaning and laundry *once a week*.

advised her to elevate her leg, nor did a physician list any recommended restrictions, like mandatory breaks, as a result of swelling or pain. The ALJ also stated that "given the claimant's allegations of disabling pain symptoms, one might expect to see some indication in the treatment records of restrictions placed on the claimant by a treating physician"; however, the records did not contain any opinions from treating or examining physicians indicating that the claimant was disabled or had limitations greater than those determined in his decision. (R. 16, 245-320, 330-343).

The ALJ considered opinion testimony given by the claimant's sister-in-law and assigned it very little weight. In doing so, he stated that the claimant's sister-in-law only sees her once every two weeks and noted that "barely any" subjective information existed in the report. The ALJ stated that the sister-in-law's testimony regarding the claimant's daily activities should be highly suspect as mere recitation of the claimant's own subjective complaints because the sister-in-law does not see the claimant regularly. (R. 17).

Lastly, the ALJ found that the claimant could not perform any past relevant work, but could perform other work that exists in significant numbers in the national economy. Based on the vocational expert's testimony, the ALJ found that the claimant could perform representative occupations including an information clerk, an order clerk, and a hand packager. Thus, the ALJ concluded that the claimant could make a successful adjustment to other work, and, therefore, was not disabled as defined by the Social Security Act. (R. 17-18)

## VII. DISCUSSION

The ALJ properly assessed the claimant's credibility and subjective complaints under the Eleventh Circuit Pain Standard.

The claimant argues that the ALJ improperly applied the Eleventh Circuit's pain standard in assessing her subjective testimony regarding her limitations.  The pain standard applies when a claimant attempts to establish disability through her own testimony of pain or other subjective symptoms. *Holt*, 921 F.2d at 1223. "The pain standard requires evidence requires evidence of an underlying medical condition and *either* (1) objective medical evidence that confirms the severity of the alleged pain arising from that condition *or* (2) that the objectively determined medical condition is of such severity that it can be reasonably expected to give rise to the alleged pain." *Id*. (emphasis added).  This court finds that the ALJ properly applied the pain standard and that substantial evidence supports his decision.

In this case, the ALJ conceded that the claimant suffers from an underlying medical condition capable of generating pain; however, he found that the claimant's statements concerning intensity, persistence, and limiting effects of these symptoms were not fully credible to the extent that the allegations are inconsistent with his residual functional capacity assessment.

In applying the standard, if the ALJ decides not to credit the claimant's subjective testimony of pain, he must discredit it explicitly and articulate his reasons for doing so. *Brown*, 921 F. 2d at 1236. Failure to articulate the reasons for discrediting the claimant's subjective complaints of pain requires that the court accept the testimony as true. *Id*.

The ALJ articulated several reasons why he found the claimant's testimony "not credible." (R. 14-16). The claimant admits that the ALJ articulated several reasons, but argues that substantial evidence does not support those reasons. This court disagrees and finds that the ALJ articulated several reasons and supported each of those reasons with substantial evidence.

*Claimant's General Inconsistencies*

The ALJ found that the claimant's testimony contradicted her own prior admissions as well as medical records, which undermines her credibility. The ALJ pointed to four instances of inconsistency between the claimant's statements and her prior admissions or medical records: the characterization of "moderately active," prior admissions regarding daily activities, self-imposed limitations, and consistent denials of side-effects.

The ALJ first pointed to the claimant's testimony that despite taking four Lortab tablets daily, she is unable to stand for more than 5-10 minutes, cannot walk for more than 10 minutes, and cannot sit for more than 15-20 minutes. However, the ALJ noted the medical records contained the claimant's consistent description of a "moderately active" activity level. (R. 32, 266-320, 330-343). Although the claimant asserts that the ALJ improperly characterized her activity as "moderately active" because "there is simply no explanation of exactly what activities the [claimant] was engaged in," the ALJ specifically noted activities the claimant admitted, such as "she exercised by walking." Thus, this court finds the ALJ's reliance on "moderately active" reasonable. (R. 303-302, 266-320, 330-343). The ALJ found, and this court agrees, that the claimant's allegation of debilitating pain is inconsistent the medical records showing that she claimed a "moderately active" activity level at every appointment since December 2011.

Another inconsistency the ALJ noted involved the claimant's testimony regarding her daily activities. Although the claimant argues that an ALJ may not rely on a claimant's daily activities to discredit the claimant, the Eleventh Circuit has also found that claimant's daily activities may be considered in evaluating and discrediting complaints of disabling pain. *Cf. Harwell v. Heckler*, 735 F.2d 1292, 1293 (11th Cir. 1984); *see also Dyer*, 395 F. 3d at 1212

(endorsing the ALJ's consideration of a claimant's activities of daily living in assessing credibility).

The ALJ used the claimant's statements regarding daily activities to show inconsistency, not the claimant's ability or disability. In considering daily activities, the ALJ noted differences between the Function Report and the claimant's testimony. In the Function Report, the claimant admitted to preparing sandwiches and *cooking vegetables* every other day and performing light housecleaning and laundry once a week. She also indicated that *she needed no help* in maintaining her residency. The ALJ alluded to the claimant's testimony regarding daily activities, during which she stated that she cooked by preparing sandwiches and *"microwave cooking"* and *her sister helped* perform light housecleaning and laundry once a week. The ALJ pointed out that the Function Report was inconsistent with the claimant's testimony that she could not perform these daily activities as she spends "most of the time" sleeping because "the medicine has got [her] asleep."

The claimant asserts that the ALJ improperly referenced daily activities without listing their corresponding limitations. The claimant specifically argues that the ALJ neglected to state that it takes the claimant "all day" to perform light housecleaning and do laundry. The claimant also argues that the ALJ neglected to state that her cooking consists of "sandwiches and microwave cooking."  The ALJ need not include every detail when noting her inconsistent statements regarding her daily activities for the purpose of evaluating her credibility.

The claimant references *Horton v. Barnhart* to argue that an ALJ may not rely on daily activities without stating the corresponding limitations.  *Horton v. Barnhart*, 469 F. Supp. 2d 1041, 1044 (11th Cir. 2006).  This court agrees with the findings in *Horton*, but distinguishes the context of the decision.

In *Horton*, the ALJ stated that testimony about daily activities did not support the claimant's pain allegations. In the case at hand, the ALJ stated that testimony and statements on the Function Report conflicted with each other. The inconsistencies between the statements was one reason why the ALJ found the claimant "not credible."  This court acknowledges that activities of daily living do not rule out the presence of disabling pain. This court also agrees that the chief focus is determining whether the claimant can engage in gainful employment, not whether she can perform minor household chores. Furthermore, this court agrees that an ALJ's description of a claimant's activities without limitations is disingenuous when the ALJ uses those activities to support a finding of not being disabled. However, these limitations are not relevant when used to show that a claimant's testimony is inconsistent and unreliable. *Id*. Therefore, the ALJ did not err in failing to include the "all day" time limitation and "microwave cooking" limitation in his assessment.

Although the claimant argues that differences in the record could be attributed to an increase in the claimant's pain, that argument is without merit; the record shows a decrease in pain from April 2012, during which the claimant submitted the Function Report, and August 15, 2013, when the ALJ conducted the hearing. (R. 28, 183-192). Therefore, this court agrees with the ALJ that neither the Function Report, nor the claimant's testimony, support her assertion that she is unable to perform daily activities because she sleeps all day.

The ALJ then referenced the third instance of inconsistency between the claimant's testimony and her prior admissions or medical records; the ALJ noted that the claimant testified to the necessity of elevating her leg as it is swollen "24/7." However, the ALJ correctly pointed out that no medical record supports the idea that she is medically required to elevate her leg. Furthermore, the ALJ could find no record that a physician advised her to take regular breaks

while walking, sitting, or standing. The ALJ aptly stated that "given the claimant's allegations of disabling pain symptoms, one might expect to see some indication in the treatment records of restrictions placed on the claimant by a treating physician"; however, the records did not contain any opinions from treating or examining physicians indicating that the claimant was disabled or had limitations greater than those determined in his decision. (R. 16, 245-320, 330-343). Thus, the ALJ concluded that the claimant's alleged sedentary lifestyle is restricted as a result of self-imposed limitations.

As more evidence of her inconsistencies, the ALJ noted that the claimant's explicit denials of adverse side effects from her medications contradicted her testimony that she suffered from multiple side effects. The ALJ pointed to the claimant's testimony that her medications caused "drowsiness, nausea, headaches, dizz[iness], and ma[de] her feel like a zombie." However, the ALJ stated that Dr. Cosgrove's records clearly showed the claimant's consistent denials of adverse side effects. (R. 16).

The ALJ only acknowledged side effects from an appointment on January 1, 2013, but the record reflects more reported side effects; however, the ALJ correctly pointed out that the claimant consistently denied adverse side effects. From July 2010 to May 2012, the claimant denied any adverse side effects caused by her medications except for an appointment on February 15, 2011, during which Dr. Cosgrove attributed "drowsiness" to the claimant's daily routine. Furthermore, the ALJ is required to develop the medical history for the 12 months prior to the date the application for supplemental social security income is filed. *Ellison v. Barnhart*, 355 F.3d. 1272, 1276 (11th Cir. 2003). Therefore, side effects from 2007-2010 are not relevant to a finding of disability regarding an onset date of February 28, 2012.

The court acknowledges that the claimant suffered legitimate side effects including nausea and vomiting from August 1, 2012 to some date prior to January 1, 2013; however, the record shows that these side effects diminished when the claimant voluntarily discontinued the medication to which she attributed the side effects. (R. 315-320, 330-343). Therefore, this court agrees with the ALJ that the claimant's testimony that she has been suffering from multiple side effects is inconsistent with medical records that show the claimant consistently denied adverse side effects from her medications. Therefore, this court finds that the ALJ articulated several instances of inconsistencies between the claimant's testimony and her prior admissions or medical records that show substantial evidence to support his findings regarding the claimant's credibility.

### *Nature of the Claimant's Treatment*

The ALJ found the claimant's treatment to be conservative and inconsistent with claims of continual debilitating pain. The ALJ referenced medical records from 2011 to 2013, which showed that the claimant's "pain management treatment" consisted only of medications. He also pointed to the routine pattern of appointments, generally pre-scheduled three months apart; the ALJ observed that the appointments were generally "follow-ups" and for routine refills of the same medication. (R. 266-320, 330-343). This court finds that the claimant's treatment, frequency of appointments, and general purpose of the appointments support the ALJ's finding that the treatment was routine and conservative in nature; furthermore, this court agrees with the ALJ that routine and conservative treatment is inconsistent with claims of severe pain.

### *Treatment Success*

The ALJ also considered the inconsistency between the treatment's general success and the claimant's allegation of intense chronic pain. The claimant asserts that the ALJ failed to

consider "longitudinal medical records," and instead, relied on isolated events for this finding. (R. 5). This court disagrees and finds that the ALJ analyzed the "totality of the record" in applying the Pain Standard and that substantial evidence supports his findings.

The ALJ has a duty to reflect a full record in making credibility determinations. An ALJ's credibility determination must be more than a broad rejection of the claimant's subjective complaints of pain; it must be explicitly enough for a reviewing court to conclude that the ALJ considered the claimant's medical condition as a whole. *Dyer*, 395 F. 3d at 1210.

In the present case, the ALJ closely examined the claimant's medical records. He referenced both the nature and the results of treatment spanning 2011 to 2013; he also referenced records from 2003 and 2007. (R. 15-16).

The ALJ closely evaluated results from these medical records between December 2011 and May 2013. He noted that in December 2011, the claimant described herself as "moderately active" and reported that she exercised by walking, despite complaints at the hearing of persistent pain. He also noted the claimant's mild physical examination results. (R. 273-275).

The ALJ then referenced eight more appointments. Progress notes from each appointment revealed pain improvement and inflammation reduction on March 6, 2012. The ALJ also pointed to unchanged examination results and the absence of any emergency room treatment or hospitalization during the six appointments between April 2012 and May 2013. He also referenced progress notes from May 9, 2012 that showed that the claimant denied experiencing pain on that day. (R. 266-268, 315-320, 330-343). The ALJ also referred to progress notes from January 1, 2013 that showed that the claimant reported nausea as a side effect of the Mobic, but that she voluntarily discontinued taking that medication. (R. 335-338).

The ALJ noted that the claimant consistently rated her pain as "5/10" between March 2012 and May 2013.  The court acknowledges that the record actually contain small deviations from the "5/10" pain rating; those small deviations more accurately reflect that the claimant averaged "5.5/10" over those seven appointments. (R. 266-272, 315-320, 330-343).

The ALJ referenced the claimant's overall health improvement between June 2003 and October 2007. Specifically, he mentioned the claimant's improved pain and range of motion as a result of physical therapy and cortisone shots conducted in October 2007.  *See* (R. 15, 240).

Although the claimant asserts that the ALJ improperly excluded relevant medical records and did not consider the record as a whole, the ALJ specifically stated that he made his residual functional capacity finding "after careful consideration of the *entire* record." (R. 14). The ALJ has "no rigid requirement" to "specifically refer to every piece of evidence in his decision," as long as the ALJ's decision is more than a broad rejection of the claimant's subjective complaints of pain; the ALJ's determination must be specific enough for a reviewing court to conclude that the ALJ considered the claimant's medical condition as a whole. *Dyer*, 395 F.3d at 1210-11. After reviewing the ALJ's decision and the entire medical record, this court finds that the decision is specific enough to conclude that the ALJ considered the claimant's medical conditions as a whole. Furthermore, this court concludes the omitted information is not material to the ALJ's determination as it refers to treatment over 12 months prior to the onset date and would not otherwise change the outcome of the ALJ's decision. (R. 245-260).

### Work History

The ALJ articulated that the claimant's work history did not support the claimant's allegation that she stopped working because working was too painful. The ALJ referenced the claimant's Work History Report, which showed the claimant's own admissions regarding her

27

work history from 1997 to 2012. This report showed that the claimant did not work between

1998 and 2000; the report also showed that, in 2008, she worked for a total of two weeks. The

ALJ then referenced the claimant's certified earnings record, which showed her earnings

between 1997 and 2012. The ALJ pointed out that the claimant did not work consistently even

before she alleged disability. Further, he stated that the record shows that she did not work at all

for several years. The court agrees with the ALJ that the claimant's work history and certified

earnings are sporadic and are inconsistent with claimant's allegation that she stopped working

because of pain.

### *Substantial Gainful Activity in 2008*

The ALJ also found the claimant's participation in a substantial gainful activity in 2008

did not support her claim that she was disabled to the extent that it prevented her from working.

The claimant argues that the ALJ did not rely on substantial evidence when he stated that the

claimant worked in 2008 despite her condition. (R. 15). This court agrees with the claimant that

the ALJ failed to account for the claimant's documented increase of pain.

The record contains no medical records from 2008 to substantiate the presence or lack of

pain. (R. 245-343). Furthermore, the record does not reflect pain levels prior to 2010. (R. 245-

258, 266-343). As a result, the court concludes a determination of the claimant's pain level

during the year of 2008 is impossible; therefore, the court agrees with the claimant that

substantial evidence does not support this one reason given by the ALJ for discrediting the

claimant's testimony.

However, this court finds that substantial evidence exists in the record for all his other

findings, such that substantial evidence supports every other reason the ALJ gave to support

discrediting the claimant's subjective allegation of pain.  This one unsupported reason does not

offset or negate the other solid reasons on which the ALJ based his determination that the claimant is not disabled.  Therefore, this court finds that the ALJ articulated several reasons for finding the claimant "not credible" and appropriately supported his finding with substantial evidence.

VIII. CONCLUSION

For the reasons stated above, this court concludes that the ALJ correctly applied the pain standard and that substantial evidence supports the ALJ's decision. Accordingly, this court AFFIRMS the decision of the Commissioner. The court will enter a separate Order to that effect simultaneously.

DONE and ORDERED this 4th day of August, 2016.


**KARON OWEN BOWDRE**
CHIEF UNITED STATES DISTRICT JUDGE